## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

BRYAN NELSON,
*Plaintiff*,

v.                                          No. 3:20-cv-221 (JAM)

CITY OF HARTFORD,
*Defendant*.

### ORDER GRANTING IN PART AND DENYING IN PART
### MOTION FOR SUMMARY JUDGMENT

The plaintiff in this case is a Hartford police detective who has sued the City of Hartford claiming that the City subjected him to unlawful discipline and retaliation because of his support for a fellow police officer's complaint of discrimination. The plaintiff alleges one claim under Conn. Gen. Stat. § 31-51q for unlawful discipline or discharge on account of his exercise of certain constitutional rights and a second claim of retaliation under Conn. Gen. Stat. § 46a-60(b)(4) of the Connecticut Fair Employment Practices Act. The City has moved for summary judgment on both counts. I will grant the City's motion as to Count One, but deny it as to Count Two.

### BACKGROUND

Plaintiff Bryan Nelson is a retired police officer who now lives in Arizona.[1] Nelson used to work for the defendant, the City of Hartford (the "City") as a police detective in the Major Crimes Division ("Major Crimes") of the Hartford Police Department ("HPD").[2] Nelson was promoted to the position of police detective in April 2017.[3] His superior officers in Major Crimes included Sergeants Anthony Rykowski and Jeffrey Morrison.[4]

---

[1] Doc. #1 at 1 (¶ 3).
[2] *Id.* at 1-2 (¶¶ 4-5).
[3] Doc. #50-2 at 1 (¶ 1); Doc. #51-1 at 1 (¶ 1) (admitted).
[4] Doc. #50-2 at 2 (¶ 5); Doc. #51-1 at 1 (¶ 5) (admitted).

In 2018, Samuel Cruz, another Major Crimes detective, filed a discrimination complaint with the Connecticut Commission on Human Rights and Opportunities (the "CHRO"). Cruz alleged that he was "being subjected to unlawful discrimination at work by the Division's commanding officer, Lt. Paul Cicero,"[5] and that this discrimination was on the basis of Cruz's race and ethnicity as a Hispanic Puerto Rican.[6] Cruz listed Nelson as a witness, and Nelson agreed to testify on Cruz's behalf at a hearing in front of the CHRO.[7] The CHRO notified the City that Nelson would be testifying.[8]

Nelson alleges that on the afternoon of October 23, 2018, Lieutenant Cicero ordered Nelson to follow him to the police chief's conference room. On the way, Lieutenant Cicero referenced Cruz's complaint to the CHRO.[9] Nelson confirmed that he was planning to testify at the hearing on behalf of Cruz.[10] In the conference room, Nelson met a deputy police chief and the City's attorney, who was representing both the City and Lieutenant Cicero in the CHRO proceeding.[11] The attorney asked Nelson if he would answer questions about Cruz's complaint in advance of the CHRO hearing, but Nelson declined to do so.[12] Nelson then left the conference room without answering any questions.[13]

The parties agree that Nelson was not forced to answer any questions, nor was he asked anything further. Nelson also did not make any further statements while in the conference room. Nelson was only in the conference room for about three to four minutes, and "nothing of

---

[5] Doc. #1 at 2 (¶ 6).
[6] Doc. #50-2 at 2 (¶ 6); Doc. #51-1 at 1 (¶ 6) (admitted).
[7] Doc. #1 at 2 (¶ 7).
[8] *Ibid.*
[9] *Id.* at 2 (¶ 8).
[10] *Ibid.*
[11] *Id.* at 2-3 (¶ 9); Doc. #51-1 at 5 (¶ 1).
[12] Doc. #1 at 2-3 (¶ 9).
[13] *Ibid.*

substance was discussed prior to his leaving."[14] Lieutenant Cicero did not say anything to

Nelson, and Sergeants Rykowski and Morrison were not present in the conference room.[15]

Nelson found it "intimidating" to be confronted in the conference room by a deputy police chief,

the City's attorney, and his commander Lieutenant Cicero.[16]

The next day, Nelson testified on Cruz's behalf in front of the CHRO.[17] Nelson testified

that he did *not* believe Cruz was retaliated or discriminated against because he is Hispanic and

Puerto Rican.[18] Nelson also states that, while he "no longer remembers exactly what he said in

his testimony at the CHRO hearing," he did testify that the Police Chief James Rovella was

targeting Cruz.[19]

The parties agree that when Nelson testified, the only other individuals in the room were

Cruz, the CHRO mediator, the City's attorney, and Deputy Chief Rendock.[20] The parties agree

that Sergeants Aaron Bosivert, Morrison, and Rykowski were not involved in the CHRO hearing,

were not witnesses, and did not attend the hearing, and they further agree that Morrison and

Rykowski were not aware that Nelson testified or of what he said.[21]

As described in detail below, Nelson alleges that after he testified at Cruz's CHRO

hearing, he was "subjected to a pattern of harassment from Lt. Cicero and his immediate

subordinates who were [Nelson's] superior officers."[22] Nelson also alleges that he was subjected

to "other formal but false accusations in the period between the meeting at the CHRO and

---

[14] Doc. #50-2 at 3 (¶ 11); Doc. #51-1 at 2 (¶ 11) (admitted).
[15] Doc. #50-2 at 3 (¶¶ 12, 13); Doc. #51-1 at 2 (¶¶ 12, 13) (admitted).
[16] Doc. #51-1 at 5 (¶ 1).
[17] Doc. #50-2 at 3-4 (¶¶ 14-15); Doc. #51-1 at 2 (¶¶ 14-15) (admitted).
[18] Doc. #50-2 at 4 (¶ 18); Doc. #51-1 at 2 (¶ 18) (admitted).
[19] Doc. #51-1 at 9 (¶¶ 23-24).
[20] Doc. #50-2 at 4 (¶ 16); Doc. #51-1 at 2 (¶ 16) (admitted).
[21] Doc. #50-2 at 4-5 (¶¶ 21-22); Doc. #51-1 at 2 (¶¶ 21-22) (admitted).
[22] Doc. #1 at 3 (¶ 11).

February 21, 2019."[23]

### *The meeting of October 26, 2018*

On October 26, 2018, Sergeants Rykowski and Morrison called a Major Crimes meeting of all on-duty detectives—including Nelson—to discuss operations in the division. Lieutenant Cicero did not attend this meeting.[24] The parties agree that Nelson recorded part of this meeting, but never told Sergeant Rykowski that he did, and they dispute whether Nelson made this recording "secretly."[25]

Nelson asserts that on October 29, 2018, he filed a complaint with Lieutenant Kevin O'Brien of the HPD, alleging that Lieutenant Cicero and others, including the City's Human Resources department, "had attempted to intimidate him to improperly influence his anticipated testimony" at Cruz's CHRO hearing.[26]

The parties also agree that on November 28, 2018, Sergeants Rykowski and Morrison "initiated a report of disciplinary infraction concerning Nelson's conduct at the October 26, 2018 [meeting], [and] determined [Nelson] … to be in violation of [HPD] Code of Conduct Section 1.0 (Conduct Unbecoming an Officer) and 6.05 (Using rude, insulting or offensive language, or other offensive behavior towards a supervisor)."[27] This report was reviewed and recommended for disciplinary action through the HPD chain of command.[28]

Nelson denies that he called Lieutenant Cicero a "cancer" at the meeting on October 26, 2018, but admits that he did so at a prior meeting with other Major Crimes detectives in 2017.[29]

---

[23] *Id.* at 3 (¶ 13).
[24] Doc. #50-2 at 6 (¶ 28); Doc. #51-1 at 3 (¶ 28) (admitted in part, maintaining that the purpose of this meeting was to discuss any and all concerns about the operation of the Division).
[25] Doc. #50-2 at 7 (¶ 35); Doc. #51-1 at 3 (¶ 35) (admitted in part).
[26] Doc. #51-1 at 7-8 (¶ 15); Doc. #51-7.
[27] Doc. #50-2 at 6 (¶ 29); Doc. #51-1 at 3 (¶ 29) (admitted).
[28] *Ibid.*
[29] Doc. #50-2 at 6 (¶ 31); Doc. #51-1 at 3 (¶ 31) (admitted). Nelson maintained in his deposition that he did not call Lieutenant Cicero a "cancer" at the meeting on October 26, 2018. *Ibid.*

Nelson also claims that Lieutenant Cicero called him and Cruz "cancers" in 2017, but was not disciplined for it.[30]

Nelson further alleges that on February 21, 2019, he was "accused of referring to Lt. Cicero in derogatory terms at [the] meeting of the Major Crimes Division on October 26, 201[8]."[31] Nelson maintains that this accusation was false, but that he was nevertheless ordered to file a written response to it.[32]

On February 8, 2019, Captain Jeffrey Rousseau told Sergeant Rykowski to submit interrogatories to all Major Crimes detectives in attendance at the meeting on October 26, 2018 in order to determine what each detective recalled of Nelson's conduct at that meeting.[33] Sergeant Rykowski asked all detectives in attendance—including Nelson—to submit written responses to written interrogatories, with several officers confirming the allegations against Nelson, while Nelson maintains that other officers did not remember Nelson engaging in that conduct and that one officer's account contradicted the allegations.[34]

### Other disciplinary investigations re call backs and parking

Other disciplinary investigations concerning Nelson's conduct occurred while Nelson was a detective at the HPD—namely, investigations over Nelson's failure to answer call backs when required and Nelson's decision to park his fleet car in a restricted area at the HPD. The City maintains that on September 6, 2018, Assistant Chief Rafael Medina issued a memorandum to all Major Crimes officers describing a certain protocol that requires detectives to promptly respond to all call backs.[35] On October 14, 2018, Major Crimes "institute[d] a standard call back

---

[30] Doc. #51-1 at 3 (¶ 32).
[31] Doc. #1 at 3 (¶ 12). The complaint states that the Major Crimes meeting occurred on October 26, 2019, but it appears that this is a typo and that Nelson is referring to the meeting that took place in 2018.
[32] *Ibid.*
[33] Doc. #50-2 at 7 (¶ 33); Doc. #51-1 at 3 (¶ 33) (admitted).
[34] Doc. #50-2 at 7 (¶ 34); Doc. #51-1 at 3 (¶ 34) (admitted in part).
[35] Doc. #50-2 at 7 (¶ 36). Nelson admits this fact in part, but does not specify which part he denies. Doc. #51-1 at 3

procedure for detectives, that two detectives will be on call primarily for a period of one week with secondary officers as back up, with secondary detectives becoming primary the following week."[36]

The parties agree that on January 20, 2019, Nelson and Officer Flores were listed as primary on call. Sergeant Morrison assigned Flores as a call back for a sudden death investigation, but when he called Nelson, Nelson failed to answer. Morrison instead had to contact Detective Fuschino to assist Flores.[37] That same day, Sergeant Rykowski called Nelson and Detective Thorpe at 8:20pm for a double stabbing, and while Thorpe answered the call back, Nelson did not.[38] Nelson admits that he failed to respond both times.[39]

The next day, Sergeant Rykowski ordered Nelson to file a report to explain his failures to answer or call back, and Nelson wrote that he did not respond to the call backs because he was asleep.[40] On January 23, 2019, Sergeant Morrison issued a Report of Disciplinary Infraction against Nelson "for violation of Section 5.08 (Negligent failure to comply with any lawful orders, procedures, directives, or regulations, oral or written)."[41] This report was reviewed and recommended for appropriate disciplinary action.[42] While Nelson admits to this, he claims that he explained in writing that this "disciplinary action was disparate and constituted retaliation."[43]

The other disciplinary investigation into Nelson's conduct that occurred after the CHRO hearing concerned car parking at the HPD. On October 9, 2018, Lieutenant Cicero sent an email to all Major Crimes detectives that included a reminder that there were "parking spaces allotted

---

(¶ 36).
[36] Doc. #50-2 at 7-8 (¶ 37); Doc. #51-1 at 3 (¶ 37) (admitted).
[37] Doc. #50-2 at 8 (¶ 38); Doc. #51-1 at 4 (¶ 38) (admitted).
[38] Doc. #50-2 at 8 (¶ 39); Doc. #51-1 at 4 (¶ 39) (admitted).
[39] Ibid.
[40] Doc. #50-2 at 8 (¶¶ 40-41); Doc. #51-1 at 4 (¶¶ 40-41) (admitted).
[41] Doc. #50-2 at 8-9 (¶ 42); Doc. #51-1 at 4 (¶ 42) (admitted).
[42] Ibid.
[43] Ibid.

to fleet vehicles and that no cars should be parking anywhere else in the rear, side or front lot."[44] On November 17, 2018, Nelson parked his fleet car in the rear of the HPD building. And while Nelson had been instructed four days earlier, on November 13, 2018, to leave the key for his vehicle in the car, he failed to do so.[45]

On November 20, 2018, Sergeant Rykowski initiated a report of disciplinary infraction against Nelson for "violating Section 6.09 (Intentional and willful failure to comply with any lawful orders, procedures, directives or regulations, oral or written.)"[46] Nelson admits that he had been previously disciplined under the same charge on July 26, 2012, August 29, 2013, and February 14, 2016.[47] But Nelson asserts that while he did not park his fleet car where he was supposed to, many other officers also did the same but were not disciplined for it like Nelson was.[48]

Nelson agrees with the City that Sergeants Rykowski and Morrison were the ones who initiated these disciplinary investigations against him, and he also agrees that Lieutenant Cicero did not charge Nelson with any violations or issue any punishment against Nelson.[49] Nelson maintains that Lieutenant Cicero nevertheless was responsible for the disciplinary investigations, as he was the commander of Major Crimes.[50]

But during this time, Nelson was never formally charged with discipline for violations of the HPD Code of Conduct, and Nelson did not receive any punishment. The parties agree that the City did not issue any discipline against Nelson after October 23, 2018.[51]

---

[44] Doc. #50-2 at 9 (¶ 43); Doc. #51-1 at 4 (¶ 43) (admitted).
[45] Doc. #50-2 at 9 (¶ 45); Doc. #51-1 at 4 (¶ 45) (admitted).
[46] Doc. #50-2 at 9-10 (¶ 46); Doc. #51-1 at 4 (¶ 46) (admitted).
[47] *Ibid.*
[48] Doc. #51-1 at 7 (¶ 13).
[49] Doc. #50-2 at 10 (¶¶ 47-48); Doc. #51-1 at 4 (¶¶ 47-48) (admitted).
[50] Doc. #51-1 at 7 (¶ 12).
[51] Doc. #50-2 at 10 (¶ 49); Doc. #51-1 at 4 (¶ 49) (admitted).

### *Nelson's complaints*

Nelson asserts that he filed a complaint by email with Lieutenant O'Brien on January 18, 2019 in which he "asserted that Lt. Cicero and Sgt. Jeffrey Morrison were subjecting [Nelson] to harassment and irrational discipline without justification."[52] In that email, Nelson wrote that he felt that Lieutenant Cicero and Sergeant Morrison's behavior was "a direct result and retaliation from the two on-going complaints that I have already filed against Lieutenant Cicero" and that Lieutenant Cicero "is ordering Sergeant Morrison to excessively discipline me in the same manner that then Sergeant Bosivert did."[53]

On March 18, 2019, Nelson filed his own complaint with the CHRO regarding the alleged retaliation.[54] Nelson received a Release of Jurisdiction from the CHRO on November 29, 2019.[55] Nelson also notified the City on April 19, 2019 that he had filed a charge of employment discrimination with the United States Equal Employment Opportunity Commission ("EEOC").[56]

### *Nelson's sick leave and resignation*

Nelson took sick leave from February 2019 to August 2019, and entered the Employee Assistance Program to seek counseling.[57] Nelson claims that he took sick leave and entered the program because "he could not handle working in the Major Crimes Unit anymore" as the "environment there was so toxic that he could not be there" and he did not feel "psychologically safe."[58]

Nelson returned from sick leave in August 2019. Instead of returning to Major Crimes, Nelson was assigned to the Property Room Division through an arrangement reached between

---

[52] Doc. #51-1 at 8 (¶ 16).
[53] Doc. #51-8 at 2.
[54] Doc. #51-1 at 9 (¶¶ 20-22).
[55] Doc. #1 at 7 (¶ 17).
[56] Doc. #51-1 at 7 (¶ 14).
[57] Doc. #50-2 at 10 (¶ 50); Doc. #51-1 at 4 (¶ 50) (admitted).
[58] Doc. #51-1 at 6 (¶ 5).

Nelson and then-Chief of Police Jason Thody.[59] Nelson states that upon his return, he did not seek any further counseling or treatment for stress because he "felt he did not need anything further because he was no longer working with Cicero."[60]

Nelson remained in the Property Room Division from August 2019 until December 2019, when he resigned from the HPD entirely.[61] Nelson resigned through a letter to Chief Thody on December 13, 2019, which Chief Thody accepted on December 16, 2019.[62] Nelson claims that upon submitting his resignation, he was not given an exit interview or the usual courtesy of meeting with the Chief before leaving.[63]

Nelson alleges that as a result of the false accusation, his "working environment became so hostile that he was constrained to take an early retirement from the [HPD], causing him economic losses in addition to the emotional distress inflicted upon him."[64] He alleges that his working conditions were "made so difficult and unpleasant that any reasonable officer in [his] position would have felt compelled to resign."[65] Nelson alleges that his early retirement was therefore a constructive discharge.[66]

The parties agree that Lieutenant Cicero had no personal encounters or interactions with Nelson between the CHRO hearing in October 2018 and the date of Nelson's resignation in December 2019.[67]

The parties also agree that Nelson had been applying for other jobs prior to 2018, but

---

[59] Doc. #50-2 at 11 (¶ 52); Doc. #51-1 at 4 (¶ 52) (admitted).
[60] Doc. #50-2 at 10-11 (¶ 51); Doc. #51-1 at 4 (¶ 51) (admitted).
[61] Doc. #50-2 at 11 (¶ 53); Doc. #51-1 at 4 (¶ 53) (admitted).
[62] Doc. #50-2 at 11 (¶ 57); Doc. #51-1 at 5 (¶ 57) (admitted).
[63] Doc. #51-1 at 5-6 (¶ 4).
[64] Doc. #1 at 3 (¶ 14).
[65] *Id.* at 3 (¶ 15).
[66] *Id.* at 3-4 (¶ 15).
[67] Doc. #50-2 at 5 (¶ 25); Doc. #51-1 at 2 (¶ 25) (admitted).

chose not to apply to any jobs in Connecticut.[68] While on sick leave in 2019, Nelson applied to jobs in Arizona.[69] In October 2019, Nelson applied to a job in Arizona, and accepted the subsequent job offer on December 10, 2019.[70] Nelson claims that he felt he "had to leave Connecticut because of what was happening to him in the [HPD]" and he knew that "if he applied to another department in Connecticut he would be asked why he was leaving Hartford."[71] Nelson felt that he would "face a great deal of questioning or skepticism about the fact that he was leaving" and he "simply could not deal with it."[72]

### Nelson's court complaint

Nelson brings two claims against the City. First, Nelson alleges that the City disciplined and discharged him because of his free speech activity, in violation of Conn. Gen. Stat. § 31-51q.[73] Second, Nelson alleges that the City retaliated against him because of his testimony and support of Cruz's CHRO complaint, in violation of Conn. Gen. Stat. § 46a-60(b)(4).[74]

The City has now moved for summary judgment on both counts.[75]

## DISCUSSION

The principles governing my review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if

---

[68] Doc. #50-2 at 12 (¶ 59); Doc. #51-1 at 5 (¶ 59) (admitted).
[69] Doc. #50-2 at 12 (¶ 60); Doc. #51-1 at 5 (¶ 60) (admitted).
[70] Doc. #50-2 at 12 (¶ 61); Doc. #51-1 at 5 (¶ 61) (admitted).
[71] Doc. #51-1 at 6 (¶ 7).
[72] Ibid.
[73] Doc. #1 at 4 (¶ 16).
[74] Id. at 7 (¶ 16).
[75] Doc. #50.

eventually proven at trial—to allow a reasonable jury to decide the case in favor of the opposing

party. My role at summary judgment is not to judge the credibility of witnesses or to resolve

close contested issues but solely to decide if there are enough facts that remain in dispute to

warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*);

*Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).[76]

### *Count One – Conn. Gen. Stat. § 31-51q*

Nelson brings his first claim under Conn. Gen. Stat. § 31-51q, which provides that no

employer may "subject[] any employee to discipline or discharge on account of the exercise by

such employee" of free speech rights that would otherwise be protected by the First Amendment

or the Connecticut Constitution. As the text of § 31-51q makes clear, it is "restricted to

retaliation … in the form of 'discipline or discharge,' which may not extend to as broad a range

of actions as the 'adverse action' requirement that applies for a claim of First Amendment

retaliation … under 42 U.S.C. § 1983." *Bourne v. City of Middletown*, 2017 WL 1138125, at *9

n.5 (D. Conn. 2017).

The City argues that no reasonable jury could conclude that Nelson was subject to

"discipline or discharge" as required for a claim under § 31-51q. I agree.

"Discipline" means "chastisement imposed as a penance or as a penalty, or punishment

intended to correct or instruct, especially a sanction or penalty imposed after an official finding

of misconduct." *Avedisian v. Quinnipiac Univ.*, 387 F. App'x 59, 61 (2d Cir. 2010) (discussing

§ 31-51q). Discipline thus involves "punishment that (at least while the punishment is being

inflicted) leave[s] the recipients in a less happy state than that which they enjoyed before the

punishment began." *Ibid.* (quoting *Bombalicki v. Pastore*, 2000 WL 726839, at *1 (Conn. Super.

---

[76] Unless otherwise indicated, this opinion omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

Ct. 2000) (Blue, J.)); *see also Brown v. Halpin*, 885 F.3d 111, 118 (2d Cir. 2018) (*per curiam*) (employee's transfer causing loss of benefits and ineligibility for promotion was "discipline" under § 31-51q).

The undisputed facts do not show any act of punishment or disability. To the contrary, Nelson has admitted that while he was "aware of pending disciplinary investigations into his conduct"—in relation to the October 26, 2018 meeting, his failure to answer two call backs, and his decision to park in a restricted area—he was "never formally charged with discipline for violating the Code of Conduct, nor did he receive any form of punishment on those charges."[77] Nelson further admits that after the CHRO hearing on October 23, 2018, the City "did not issue any discipline against [him]."[78] No reasonable jury could conclude that he was subject to discipline as required to sustain a claim under § 31-51q.

The same holds true for Nelson's claim of "discharge" under § 31-51q. Nelson resigned his position but insists that it amounted to a constructive discharge. "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, *intentionally* creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Karagozian v. USV Optical, Inc.*, 238 A.3d 716, 722 (Conn. 2020).

By the time he resigned in December 2019, Nelson had been away from Major Crimes, Lieutenant Cicero, and Sergeants Rykowski and Morrison for almost a year. He had also been working in the Property Room Division—again, away from Major Crimes' alleged toxic work environment—for about four months before he resigned.

---

[77] Doc. #50-2 at 10 (¶ 49); Doc. #51-1 at 4 (¶ 49) (admitted).

[78] *Ibid.*

Nelson argues that a jury could "find that it was entirely reasonable for him to believe" that his reassignment to the Property Room Division upon his return from sick leave in August 2019 was "at best a temporary respite which could not save his Hartford career."[79] But Nelson also admits that upon his return, he did not seek any further counseling or treatment for stress because he "felt he did not need anything further because he was no longer working with Lieutenant Cicero."[80]

In addition, the parties agree that Nelson was applying to other jobs and that he chose not to apply to any jobs in Connecticut.[81] Nelson also applied to jobs in Arizona both while he was on sick leave and after he returned to the HPD, and he accepted one of these jobs just three days before he resigned on December 13, 2019.[82] Under all these circumstances, no reasonable jury could conclude that Nelson's resignation amounted to a constructive discharge.

In short, even assuming that Nelson engaged in protected speech activity under § 31-51q, there is no genuine issue of fact to support his claim that he was subject to discipline or discharge because of this protected activity. Accordingly, I will grant the City's motion for summary judgment as to Count One.

### Count Two – Conn Gen. Stat. 46a-60(b)(4)

Nelson brings his second claim under § 46a-60(b)(4) of the Connecticut Fair Employment Practices Act ("CFEPA"). This statute prohibits an employer from discriminating against an employee because the employee "has opposed any discriminatory employment practice or because such person has filed a complaint or testified or assisted in any proceeding under section 46a-82, 46a-83 or 46a-94." Conn. Gen. Stat. § 46a-60(b)(4).

---

[79] Doc. #51 at 8.
[80] Doc. #50-2 at 10-11 (¶ 51); Doc. #51-1 at 4 (¶ 51) (admitted).
[81] Doc. #50-2 at 12 (¶ 59); Doc. #51-1 at 5 (¶ 59) (admitted).
[82] Doc. #50-2 at 12 (¶¶ 60-61); Doc. #51-1 at 5 (¶¶ 60-61) (admitted).

Retaliation claims under CFEPA are "evaluated under a three-step burden shifting analysis. First, in order to establish a prima facie case of retaliation, a plaintiff must show that: (1) she is engaged in protected participation or opposition under the CFEPA; (2) that the employer was aware of this activity; (3) that the employer took adverse action against the plaintiff; and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *Brauer v. MXD Grp., Inc.*, 2019 WL 4192181, at *3 (D. Conn. 2019).

The City argues that Nelson did not engage in protected activity. But there is no dispute that he testified at a CHRO proceeding and that § 46a-60(b)(4) expressly protects from discriminatory retaliation one who has "testified or assisted in any proceeding under [Conn. Gen. Stat.] section 46a-82, 46a-83 or 46a-94" which include administrative proceedings before the CHRO.

While Nelson may have testified that he did not believe Cruz was targeted for unfair treatment *because* Cruz is Hispanic and Puerto Rican, there is also evidence that Nelson did think that Cruz was being unfairly treated or targeted at the HPD and testified to that effect. In any event, it does not matter whether Nelson fully supported every one of Cruz's claims when he testified at the CHRO hearing or that Nelson supported some claims, but not others. All the statute requires is that Nelson testified.

The City next argues that it did not engage in an adverse action against Nelson. An "adverse action" for purposes of a state law retaliation claim under CFEPA is the same as for purposes of a federal law claim of retaliation under the Title VII of the Civil Rights Act of 1964. *See Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010). It is an action that "a reasonable employee" would have found to be "materially adverse," meaning that it might have

"dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). "In determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).

Here, notwithstanding my conclusion that the actions taken by the City did not amount to "discipline" or "discharge" for purposes of a free-speech retaliation claim under Conn. Gen. Stat. § 31-51q, the same cannot be said for whether they amount to an "adverse action" for purposes of a CFEPA retaliation claim under Conn. Gen. Stat. § 46a-60(b)(4). *See Bourne*, 2017 WL 1138125, at *9 n.5 (noting distinction between § 31-51q and retaliation under federal law).

Nelson alleges that he was subject to disciplinary investigations in retaliation for testifying at Cruz's CHRO hearing. While Nelson admits that he was never actually subjected to discipline, there is a genuine fact issue whether these investigations were genuine or were meant to retaliate against Nelson because of his testimony at the CHRO. These investigations— including those of Nelson's statements at the meeting on October 26, 2018, his response to call backs, and his parking—occurred very close in time to his testimony before the CHRO on October 23, 2018. And Nelson has adduced enough facts to create a jury question as to the grounds for and motives for these investigations.

In short, viewing the facts in the light most favorable to Nelson, I conclude that there is a genuine fact issue to suggest that the City engaged in an adverse action against Nelson because of his testimony at the CHRO. Accordingly, I will deny the City's motion for summary judgment as to Count Two.

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment (Doc. #50) is

GRANTED as to Count One, unlawful discipline or discharge under Conn. Gen. Stat. § 31-51q,

and DENIED as to Count Two, retaliation under Conn. Gen. Stat. § 46a-60(b)(4) of the

Connecticut Fair Employment Practices Act.

It is so ordered.

Dated at New Haven this 18th day of January 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge